JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: Victor M. Ortiz, Debtor. | ) CASE NO. CV 08-06116 MMM<br>) BANKRUPTCY NO. BK  08-10004 RR<br>) ADVERSARY NO. AP 08-01037 RR |
| TOP RANK, INC., a Nevada Corporation, | ) |
| Appellant, | ) |
| vs. | ) ORDER REVERSING DECISION OF THE<br>) BANKRUPTCY COURT |
| VICTOR M. ORTIZ, an individual, | ) |
| Appellee. | ) |
| | ) |

        Top Rank, Inc. appeals an order of the bankruptcy court granting Victor M. Ortiz's motion for summary judgment on its claims for declaratory and injunctive relief.  The order was entered on August 18, 2008, and Top Rank timely appealed.


## I.  FACTUAL AND PROCEDURAL BACKGROUND

        Ortiz is a professional boxer; Top Rank is a boxing promoter.[1]  In 2005, Ortiz and Top Rank entered into a five-year promotional agreement,[2] pursuant to which Ortiz agreed to fight annually in a

---

[1]Appellant's Opening Brief ("Appellant's Brief") at 1.

[2]Excerpts of the Record in Support of Opening Brief ("ER") at 28-42.

minimum number of bouts promoted by Top Rank and Top Rank agreed to pay Ortiz a guaranteed minimum purse per bout.[3]  The agreement contained an exclusivity provision, requiring that Ortiz fight only in televised bouts promoted by Top Rank.[4]  The contract prohibited Ortiz from fighting in bouts for another promoter for ninety days before or after a televised appearance promoted by Top Rank.[5]

On January 2, 2008, Ortiz filed a voluntary Chapter 7 bankruptcy petition.  On April 21, 2008, he filed an adversary action against Top Rank, seeking declaratory relief, a permanent injunction, and attorneys' fees and costs.[6]  Ortiz argued that the promotional agreement was rejected by operation of law on March 3, 2008, because the bankruptcy trustee did not assume his obligations under the contract within sixty days after the bankruptcy action was filed, and Top Rank took no action to prevent its rejection within that period.[7]  See 11 U.S.C. § 365(d)(1) ("In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected").

Ortiz asserted that Top Rank had interfered with his efforts to enter an agreement with Golden Boy Productions, another boxing promoter, by advising Golden Boy that the promotional agreement was still valid.[8]  Ortiz sought a declaration that he was no longer required to perform his obligations under the promotional agreement and an injunction prohibiting Top Rank from interfering with future negotiations between Ortiz and third parties.[9]  On August 18, 2008, the bankruptcy court entered

---

[3]*Id.* at 17.

[4]*Id.* at 20.

[5]*Id.*

[6]Appellee's Opening Brief ("Appellee's Brief) at 4.

[7]Complaint, ¶¶ 14-16.

[8]*Id.*, ¶¶ 14-16, 20.

[9]*Id.*, Prayer for Relief, ¶¶ 1, 2.

1   judgment in Ortiz's favor on the declaratory and injunctive relief claims.[10]  It concluded that the trustee's

2   rejection of the promotional agreement terminated all of Ortiz's obligations under the agreement; and that

3   Top Rank's rights under the agreement were limited to seeking monetary damages against the bankruptcy

4   estate.[11]  The court also found that even if the trustee's rejection of the contract did not terminate Ortiz's

5   obligations, the exclusivity provision was unenforceable under Nevada law as an unreasonable non-

6   competition agreement.[12]

7        Top Rank appealed the ruling on August 26, 2008.[13]  It contends (1) that the bankruptcy court

8   erred as a matter of law in finding that the trustee's rejection of the promotional agreement extinguished

9   all of Top Rank's non-monetary rights under the contract;[14] (2) that the court committed reversible error

10  by addressing the reasonableness of the exclusivity provision under Nevada law because Ortiz did not

11  raise the issue in his motion for summary judgment and it did not have an opportunity to conduct

12  discovery or present evidence on the issue;[15] and (3) that, even if it was appropriate for the bankruptcy

13  court to address the reasonableness of the exclusivity provision, it erred in finding that the clause was

14  unreasonable as a matter of law.[16]

15

16                                    **II. DISCUSSION**

17  **A.    Standard of Review**

18       The district court has jurisdiction to hear appeals from final judgments, orders or decrees  of the

19  bankruptcy court.  28 U.S.C. § 158(a).  When reviewing a decision of the bankruptcy court, a district

20

21  _____

22       [10]ER at 526-29.

23       [11]*Id.* at 514.

24       [12]*Id.* at 507.

25       [13]*Id*. at 530-32.

26       [14]Appellant's Brief at 3.

27       [15]*Id.*

28       [16]*Id.*

3

court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal. *In re Webb*, 954 F.2d 1102, 1103-04 (5th Cir. 1992). The district court must accept the bankruptcy court's findings of fact unless they are clearly erroneous. A finding is clearly erroneous "'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re Banks*, 263 F.3d 862, 869 (9th Cir. 2001) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). The district court reviews the bankruptcy court's conclusions of law *de novo*. *In re Cohen*, 300 F.3d 1097, 1101 (9th Cir. 2002); *In re Anastas*, 94 F.3d 1280, 1283 (9th Cir. 1996).

**B.      Whether Rejection of the Promotional Agreement Terminated Ortiz's Obligations Under the Agreement**

**1.      Standards Governing Rejection of Executory Contracts in Bankruptcy**

The parties' dispute concerns the effect of the rejection of an executory personal contract in bankruptcy; this issue is addressed in 11 U.S.C. § 365. Section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Section 365(d)(1) provides that "[i]n a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected." The parties agree that the promotional agreement was an "executory contract" as that term is defined in bankruptcy law, and do not dispute that it was "deemed rejected" by the trustee's failure to assume it.

Section 365(g) describes the effect of such a rejection:

"Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease –

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; or

(2) if such contract or lease has been assumed under this section or under a plan

4

confirmed under chapter 9, 11, 12, or 13 of this title –

(A) if before such rejection the case has not been converted under section 1112, 1208, or 1307 of this title, at the time of such rejection; or

(B) if before such rejection the case has been converted under section 1112, 1208, or 1307 of this title –

(i) immediately before the date of such conversion, if such contract or lease was assumed before such conversion; or

(ii) at the time of such rejection, if such contract or lease was assumed after such conversion."

The exceptions in sections 365(h) and (i) concern unexpired real property leases and time share agreements.  Additionally, section 365(n) provides special rules for the rejection of intellectual property license agreements.  Notably, the statute does not specifically address personal services contracts.  Thus, section 365(g) governs the rejection of such a contract.

Both parties agree that the promotional agreement was "rejected" as a result of the trustee's failure to assume it.  Ortiz argues that rejection of the agreement "terminated" it, and relieved him of any further contractual obligations.  The bankruptcy court agreed, concluding that Ortiz had no further obligations under the contract and that Top Rank's remedies were limited to filing a claim for money damages against the estate.[17]

Top Rank argues that rejection merely constitutes a pre-petition breach of the contract, which does not effect the substantive rights and obligations of the parties.[18]  Thus, it asserts that in addition to filing a claim against the estate, it may also seek injunctive relief enforcing the agreement's exclusivity provision.

The law regarding rejection of executory contracts in bankruptcy has been the subject of much confusion; one court has described it as "murky and confusing."  *In re Bergt*, 241 B.R. 17, 21 (Bankr. D. Alaska 1999).  In the past, courts treated a rejection as a cancellation or termination of the contract.

---

[17]ER at 514.

[18]Appellant's Brief at 7.

See Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection,'* 59 U. COLO. L. REV. 845 (1988) ("Andrew I") (describing the "common portrayal of the rejection of executory contracts as permitting contract revocation, cancellation, avoidance or the like"). Courts now recognize, however, that rejection does not terminate a contract. See *In re Mitchell*, 249 B.R. 55, 58 (Bankr. S.D.N.Y. 2000) ("[I]t now appears to be well-settled that rejection does not terminate an executory contract, or necessarily avoid the rights of the non-debtor party under the contract," citing *In re Lavigne*, 114 F.3d 379, 386-87 (2d Cir. 1997), and *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 709 (Bankr. S.D.N.Y.1992) (quoting Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U.COLO.L.REV. 1, 17 (1991) ("Andrew II")); see also, e.g., *In re Onecast Media, Inc.*, 439 F.3d 558, 563 (9th Cir. 2006) ("[R]ejection of an executory contract in accordance with applicable provisions of the Bankruptcy Act is not the equivalent of rescission," quoting *In re Murphy*, 694 F.2d 172, 174 (8th Cir.1982)); *Matter of Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993) ("Significantly, § 365(g)(1) speaks only in terms of 'breach.' The statute does not invalidate the contract, or treat the contract as if it did not exist. To assert that a contract effectively does not exist as of the date of rejection is inconsistent with deeming the same contract breached"); *In re The Ground Round, Inc.*, 335 B.R. 253, 262 (1st Cir. B.A.P. 2005) ("[T]he Debtor's rejection of the lease of the Property constitutes a breach of the lease as of the petition date. See 11 U.S.C. § 365(g). Accordingly, the rights and obligations of the parties remain intact after a rejection because 'rejection does not change the substantive rights of the parties to the contract, but merely means the bankruptcy estate itself will not become a party to it,'" quoting Andrew I at 848-49); *Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 709 ("Consistent with bankruptcy law's general deference to state-law rights in or to specific property, rejection of a contract does not terminate such rights that arise from rejected contracts. [R]ejection is not itself an avoiding power," quoting Andrew II at 17).

This shift in the treatment of rejection is largely due to courts' adoption of the reasoning set forth in three influential law review articles: Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection,'* 59 U. COLO. L. REV. 845 (1988), Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 MINN. L. REV. 227 (1989), and Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U. Colo. L. Rev. 1 (1991). See, e.g., *Bergt*, 241

B.R. at 21 (discussing the articles' influence and observing that they "are so well written and researched that their conclusions have been increasing[ly] adopted by bankruptcy courts (and, more recently by district and appellate courts) to resolve issues involving assumption and rejection of executory contracts. . . . Though the law review articles are secondary legal authority, they are well documented with case law and legislative history, explaining where the courts have gotten off track, and showing the proper analytical path.  Most professionals who dabble in bankruptcy and have tried to make sense of § 365 will come away with the feeling of 'that's it!'").

The articles argue that the effect of rejection is best understood by looking at the assume-or-reject decision from the perspective of the trustee of the bankruptcy estate.  A bankruptcy trustee, faced with an executory contract, has the option of assuming or rejecting (i.e., not assuming) the contract.  11 U.S.C. § 365(a).  Normally, the estate automatically succeeds to the debtor's assets.  Because an executory contract is both a potential asset and a potential liability of the debtor, however, it is treated differently. As the Ninth Circuit has explained:

> "The trustee's power to reject those executory contracts which he finds burdensome to the bankrupt's estate is an extension of his power to renounce title to and abandon burdensome property which is already a part of the estate.  Because executory contracts and leases involve future liabilities as well as rights, however, an affirmative act of assumption by the trustee is required to bring the property into the estate in order to ensure that the estate is not charged with the liabilities except upon due deliberation. Thus, executory contracts and leases – unlike all other assets – do not vest in the trustee as of the date of the filing of the bankruptcy petition. They vest only upon the trustee's timely and affirmative act of assumption."  *In re Lovitt*, 757 F.2d 1035, 1041 (9th Cir. 1985).

See also *Bergt*, 241 B.R. at 22 ("The assumption of an executory contract has the effect of making the debtors' obligations an administrative expense of the estate.  'Rejection' is merely the trustee's business judgment that the estate should not assume the burden of an executory contract as an administrative expense.  Thus, the nondebtor party has an unsecured claim for such nonperformance instead of an administrative expense claim. It is often not advisable for a trustee or debtor-in-possession to assume and

obligate itself to pay the obligation in regular U.S. dollars as opposed to rejecting and turning the claim into an unsecured claim payable in what are usually attenuated 'bankruptcy dollars' (i.e., paying 10¢ on the $1.00 is probably above average in most chapter 7 cases)," citing Andrew I at 884-89 and Westbrook at 232, 252-53 (footnotes omitted)); *In re Chestnut Ridge Plaza Associates, L.P.*,156 B.R. 477, 482-83 (Bankr. W.D. Pa. 1993)  ("Simply put, 'rejection' is the decision by the estate not to assume a lease because it is not a favorable investment.  Rejection does not alter the substantive rights of the parties to the lease.  It is merely the decision of the bankruptcy estate not to become a party to the lease thereby avoiding any unfavorable consequences of a bad bargain made prepetition by the debtor," citing Andrew I at 888).  The power of the trustee to assume or reject an executory contract originally "ha[d] a clear and fairly modest purpose: to insure that creditors of the debtor who are parties to pending contracts and leases do not become administrative creditors of the estate merely by virtue of the estate's succession to the debtor's property."[19]  Andrew I at 865.

---

[19]Professor Andrew convincingly traces the assume-or-reject doctrine to an 1818 English case, *Copeland v. Stephens*, 106 Eng. Rep. 218 (K.B. 1818). (See Andrew I at 856-65.) In *Copeland*, a lessor attempted to recover rent from a lessee who had filed for bankruptcy before the rent came due.  The lessee argued that he was not obligated to pay rent because the lease became the property of the bankruptcy assignees (forerunners of the trustee under modern bankruptcy estate).  (*Id.* at 856.)  The court rejected this argument, noting that the purpose of transferring the bankrupt's property to the assignees was to help ensure payment of the bankrupt's debts.  It therefore held that transfer of the lease, which was potentially a losing contract that might deplete the funds available to pay creditors, did not occur unless the assignees affirmatively agreed to accept it.  (*Id.* at 857.)   Professor Andrew summarizes the development of the doctrine in the wake of *Copeland* as follows:

> "The courts in these pre-statutory cases thus identified contracts and leases as assets having the perceived potential of imposing administrative liabilities upon the estate by virtue of its succession to the debtor's ownership.  Their doctrinal response was to exclude contracts and leases from the estate, notwithstanding broad and unqualified statutory language – much like that of the present Bankruptcy Code – vesting the debtor's property in the estate and making no exception for contracts and leases. The reasoning was straightforward: If the estate did not succeed to contract and lease assets it certainly could not be obligated on the liabilities that might accompany them.
> The doctrine recognized, though, that the trustee could elect to accept a contract or lease into the estate if it appeared desirable or profitable to do so.  That election would entitle the estate to the benefits of the other party's performance, at the cost of obligating the estate on the debtor's liabilities as an administrative expense, as if the estate itself had entered into the same contract or lease in the first instance."

(*Id.* at 860-61.)

As section 365 makes clear, the rejection of an executory contract constitutes a breach of the contract.[20]  "A rejection of an unexpired lease removes the lease from the bankruptcy estate, and 'constitutes a breach of such contract or lease' that is effective immediately before the petition for bankruptcy." *Onecast Media*, 439 F.3d at 563 (citing 11 U.S.C. § 365(g)).  "[R]ejection of an executory contract serves two purposes.  It relieves the debtor of burdensome future obligations while he is trying to recover financially and it constitutes a breach of a contract which permits the other party to file a creditor's claim."  *Id.* (quoting *In re Rega Props., Ltd.*, 894 F.2d 1136, 1140 (9th Cir.1990) (in turn quoting *In re Norquist*, 43 B.R. 224, 225 (Bankr. E.D. Wash.1984) (internal quotation marks omitted)).

As can be seen, one purpose of the rule that rejection constitutes a breach "is to ensure that the non-debtor party to the contract will have rights equivalent to those of other parties who are otherwise similarly situated."  Andrew I at 878.  Although rejection also serves to relieve a debtor from certain financial obligations, the breach created by rejection under the Bankruptcy Code does not terminate rights and obligations under the contract.  Rather, the debtor is relieved because monetary claims for breach are treated as claims against the estate rather than the debtor: "[r]ejection's effect is to give rise

---

[20]Professor Andrew notes that the link between rejection and breach originated in the Supreme Court's decision in *Central Trust Co. v. Chicago Auditorium Ass'n*, 240 U.S. 581 (1916). (See Andrew I at 865-74.) There, the Court announced the rule that "proceedings, whether voluntary or involuntary, resulting in an adjudication of bankruptcy, are the equivalent of an anticipatory breach of an executory agreement. . . ." *Id.* at 592.  It explained:

> "It is the purpose of the Bankruptcy Act, generally speaking, to permit all creditors to share in the distribution of the assets of the bankrupt, and to leave the honest debtor thereafter free from liability upon previous obligations. Executory agreements play so important a part in the commercial world that it would lead to most unfortunate results if, by interpreting the act in a narrow sense, persons entitled to performance of such agreements on the part of bankrupts were excluded from participation in bankrupt estates, while the bankrupts themselves, as a necessary corollary, were left still subject to action for non-performance in the future, although without the property or credit often necessary to enable them to perform." (*Id.* at 591-92 (citations omitted).)

Professor Andrew explains that "*Chicago Auditorium* . . . accomplished two goals, one favorable to the non-debtor party and the other favorable to the debtor. First, it gave the non-debtor a claim on its contract, enabling it to participate in the bankruptcy distribution. Second, as a consequence of creating a claim, the case also rendered the contract obligation subject to discharge, enhancing the relief available to the debtor." (Andrew I at 871.)  Thus, to say that rejection constitutes a breach "is to say, in effect, simply that *for claims allowance purposes in bankruptcy, it will be presumed (conclusively) that a debtor will not perform its pending obligations*." (*Id.* at 873 (emphasis original).)

1    to a remedy in the non-debtor party for breach of the rejected contract, typically a right to money

2    damages assertable as a general unsecured claim in the bankruptcy case.  Rejection has absolutely no

3    effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in

4    any other fashion terminated." *Drexel Burnham Lambert Group*, 138 B.R. at 708 (quoting Andrew II

5    at 16-17).  While courts have explained the rule as providing protection for the debtor, therefore, it is

6    clear that rejection in itself does not eliminate the non-debtor's rights under the contract.

7                    **2.      Whether Rights to Equitable Relief Survive Rejection**

8             To determine whether a claim for non-monetary relief under an executory contract can be asserted

9    post-bankruptcy against the debtor, a court must look elsewhere than section 365.  The "breach" created

10   by rejection is deemed to have occurred immediately prior to the filing of the bankruptcy petition.

11   *Onecast Media*, 439 F.3d at 563 (citing 11 U.S.C. § 365(g)).  For this reason, to the extent that breach

12   of an executory contract gives rise to a claim for money damages, that claim can be asserted only against

13   the bankruptcy estate, not against the debtor.  See *id.* (rejection-as-breach "permits the other party to file

14   a creditor's claim").  Whether the non-debtor party has a right to an equitable remedy that survives

15   bankruptcy turns on whether such right constitutes a "claim" that is dischargeable in bankruptcy.  See

16   *Mitchell*, 249 B.R. at 58-59 ("The plaintiff concedes that any pre-petition breach giving rise to a money

17   damage claim in favor of Mitchell would vest in the estate under § 541(a). Accord *Delightful Music Ltd.*

18   *v. Taylor (In re Taylor)*, 913 F.2d 102, 106 (3d Cir. 1990).  Similarly, any pre-petition breach by Mitchell

19   giving rise to a monetary claim for damages would be discharged.  Thus, the appropriate inquiry is not

20   whether the contract is estate property, but whether the debtor's statutory breach of his exclusive

21   performance obligation gives rise to a 'claim' that will be discharged under 11 U.S.C. § 727(b)"); *In re*

22   *Brown*, No. Civ.A. 97-5425, 1997 WL 786994, *4 (E.D. Pa. Nov. 26, 1997) (" We must decide whether

23   Death Row has a right to an equitable remedy against Brown which survives bankruptcy.  A discharge

24   in bankruptcy releases a debtor's liability for his or her 'debts.'  See 11 U.S.C. § 524(a).  A 'debt' is

25   defined as a liability on a 'claim.'  See 11 U.S.C. § 101(12). . . . Under the Bankruptcy Code a right to

26   an equitable remedy may be a claim only if the remedy 'gives rise to a right to payment.'  [11 U.S.C. §

27   101(5)]; *In re Continental Airlines*, No. 96-7038, 1997 WL 541985 at *9 (3d Cir. Mar.13, 1997) [ ].

28   Thus, not all rights to equitable relief against a debtor are subject to discharge in a bankruptcy

1  proceeding").

2       Bankruptcy law provides for the discharge of a bankrupt's "debts," defined as "liabilit[ies] on [

3  ] claim[s]." 11 U.S.C. § 101(12); see also *Brown*, 1997 WL 786994 at *4.  The Bankruptcy Act defines

4  a "claim" in relevant part as a "right to an equitable remedy for breach of performance if such breach

5  gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment,

6  fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. §

7  101(5)(B); see also *Brown*, 1997 WL 786994 at *4.  Thus, "[a]n equitable remedy, such as an injunction,

8  will 'give rise to a right to payment,' and therefore be discharged, if payment of a monetary remedy is

9  an alternative to the equitable remedy." *Mitchell*, 249 B.R. at 59 (citing *In re Ben Franklin Hotel*

10  *Assocs.*, 186 F.3d 301, 305 (3d Cir. 1999); *In re Continental Airlines*, 125 F.3d 120, 133 (3d Cir. 1997);

11  *In re Udell*, 18 F.3d 403, 408 (7th Cir. 1994); and *In re Chateaugay Corp.*, 944 F.2d 997, 1008 (2d Cir.

12  1991)).  The inquiry for the court, therefore, is "whether monetary payment is a viable alternative for [the

13  non-debtor's] proposed equitable remedy." *Ben Franklin Hotel Assocs.*, 186 F.3d at 305; see also *Brown*,

14  1997 WL 786994 at *4 (in determining whether a right to equitable relief is a claim, the court does not

15  apply a "specific formula," bur rather considers whether "damages [are] an adequate substitute" for the

16  equitable remedy).

17       *Brown* illustrates the application of this rule to a non-competition clause in a personal services

18  contract.  There, executory contracts between Brown, a musician, and his record label, Death Row, were

19  rejected by Brown, acting as debtor-in-possession in a Chapter 11 bankruptcy proceeding.  *Brown*, 1997

20  WL 786994 at *1-2.  Brown sought a declaration that Death Row could no longer enforce the contracts

21  against him. *Id.* at *1.  The bankruptcy court denied declaratory relief and Brown appealed. *Id.*  On

22  appeal, Death Row argued that "its right to equitable relief to prohibit Brown from breaching the

23  non-compete clauses of the various contracts [was] not dischargeable because that right [did] not qualify

24  as a 'claim' under the Bankruptcy Code." *Id.* at *3.  The district court noted that determining whether

25  Death Row's right to prohibit breach of the non-competition clauses constituted a "claim" required

26  consideration of "the remedial purpose, practicality and feasibility of issuing an injunction to enforce the

27  covenants not to compete in the agreements before us . . . .[as] dictated by state law." *Id.* at * 4.

28  Applying California law, which governed the contract, the court concluded that the non-competition

1  provisions in the agreements were not enforceable in equity.  *Id.* at *6.  Accordingly, it held that Death

2  Row's claims under the contracts were dischargeable.

### 3.     The Bankruptcy Court's Decision Regarding the Effect of Rejection

4           In its brief, Top Rank describes the effect of rejection under section 365 in terms that are

5  consistent with the court's discussion above.  It argues that rejection merely constitutes a pre-petition

6  breach that does not terminate the contract or eliminate rights under it.[21]  Ortiz does not disagree with this

7  interpretation of section 365 as a general matter.  Rather, he argues that a different rule applies to

8  personal services contracts, namely, that rejection terminates the agreement.[22]  The bankruptcy court

9  agreed with Ortiz, holding:

10          "As a result of the rejection of the promotional rights agreement, [Ortiz] has no remaining

11          obligations under that agreement.  Top Rank is limited to filing a claim for monetary

12          damages against the estate, and [Ortiz] is free to enter a promotional rights agreement

13          with any party without restrictions as to rights to televise or broadcast his professional

14          bouts."[23]

15  The court relied on four cases in reaching this conclusion.  Three of these do large number directly state

16  that rejection effects a "termination" or "cancellation" of a contract; they focus on whether rejection is

17  permissible, not on its effect.  Given their detailed analysis as to whether rejection was permissible,

18  however, the cases appear to presume that rejection terminates personal services contracts.  In any event,

19  to the extent they implicitly hold that rejection terminates or cancels a contract, the court finds the cases

20  unpersuasive, and elects instead to follow the large number of cases and well-reasoned academic

21  commentary concluding that rejection is merely a pre-petition breach and does not terminate a contract.

22  The court's view in this regard is reinforced by the fact that section 365(g) makes no exception for

23  personal service contracts.

24          The bankruptcy court relied primarily on *Matter of Taylor*, 913 F.2d 102 (3d Cir. 1990).  *Taylor*

---

26          [21]Appellant's Brief at 7.

27          [22]Appellee's Brief at 10-11.

28          [23]ER at 515.

1   concerned the decision of musician James Taylor, acting as debtor-in-possession in a Chapter 11

2   bankruptcy proceeding, to reject a music publishing agreement into which he had entered with Delightful

3   Music.  *Matter of Taylor*, 913 F.2d at 103.  The contract obligated Taylor, as lead songwriter for the

4   group Kool and the Gang, to compose and perform sufficient material for eight albums, either as a

5   member of the group or as a solo performer.  *Id.* at 104-05.  Shortly before filing a bankruptcy petition,

6   Taylor left the group to pursue a solo career; at the time, Kool and the Gang had produced only one

7   album under the contract.  *Id.* at 105.  Taylor sought and received approval from the bankruptcy court

8   and the district court to reject the publishing agreement.  Delightful argued that the agreement could not

9   be rejected because it was not properly part of the bankruptcy estate.  The court disagreed, stating: "It

10  is simply a non sequitur to suggest that a trustee may not reject an executory contract because it is not

11  property of the estate.  It is the trustee's decision (whether to assume or reject) that determines whether

12  the benefits of an executory contract will or will not become property of the estate."  *Id.* at 107.

13      The court framed the question before it as "whether executory contracts for the personal services

14  of the debtor may be rejected under § 365 of the Bankruptcy Code."  *Id.* at 104.  As a result, it did not

15  squarely address the effect of rejection; it focused primarily on whether the trustee or debtor in

16  possession had the power to reject the contract.  *Taylor* did hold, however, that Delightful "ha[d] a claim

17  against the debtor's estate for whatever damages the rejection/breach ha[d] occasioned.  This claim, like

18  the claims of other creditors, will have to be dealt with in the reorganization plan."  *Id.* at 107.  The court

19  did not articulate its rationale for concluding that Delightful's remedies were limited to filing a claim

20  against the estate; it is thus conceivable that the court believed Delightful's remedies were limited

21  because the rejection had "terminated" the contract.

22      Alternatively, the court may have implicitly found that any equitable rights Delightful had "[gave]

23  rise to a right to payment," 11 U.S.C. § 101(5), and thus were enforceable only as a claim against the

24  estate.  Such a rationale would have been consistent with the governing statutes.  If *Taylor* held that

25  Delightful was limited to a claim against the estate because rejection eliminated Taylor's obligations

26  under the contract, however, it was contrary to the weight of authority.

27      In concluding that Ortiz had no further obligations under his contract with Top Rank, the

28  bankruptcy court also relied on *In re Cirillo*, 121 B.R. 5 (Bankr. D.N.J. 1990).  *Cirillo* is a brief opinion

13

1   that, like *Taylor*, focused on whether a contract had been rejected; the opinion addressed the effect of

2   rejection indirectly, if at all.  The court stated simply: "As a result [of rejection], the remedies available

3   to Tice and Levine are limited to those provided in 11 U.S.C. § 365, and to filing a proof of claim with

4   this court.  Tice and Levine are thereby enjoined from proceeding with their state court action."  *Cirillo*,

5   121 B.R. at 7.  Because it does not directly address the effect of rejection, *Cirillo* is unpersuasive for the

6   same reasons as *Taylor*, on which it exclusively relies.

7        Additionally, the bankruptcy court cited *All Blacks B.V. v. Gruntruck*, 199 B.R. 970 (W.D. Wash.

8   1996), which like *Taylor* and *Cirillo*, addressed the power of the trustee to reject a contract rather than

9   the effect of rejection.  Citing *Taylor*, the *All Blacks* court rejected the idea that "[subsection] 365(c) bars

10  the trustee from either assuming or rejecting the contracts, [with the result that] the contracts [were] . .

11  . not part of the bankruptcy estate and [were] still enforceable."  *All Blacks*, 199 B.R. at 973-74.  More

12  importantly, the court did not treat the appellant's right to seek injunctive relief to enforce a rejected

13  personal services contract as an issue determined by the rejection.  Rather, it turned to 11 U.S.C. § 101,

14  and considered whether the appellant's right to enforce the musical group Gruntruck's obligations under

15  the personal services contract constituted  a "claim" under section 101(12).  *Id.* at 975.  The court

16  concluded that Gruntruck's obligations constituted a claim, because damages were an appropriate remedy

17  for breach of the obligations, and "'there[ was] no meaningful distinction between financial obligations

18  and obligations to perform.'"  *Id.* (quoting the bankruptcy court's opinion).  If rejection itself had

19  extinguished all Gruntruck's obligations to perform under the rejected executory contract, there would

20  have been no need to determine whether equitable relief to enforce those was obligations was  a "claim."

21  This aspect of the court's discussion, therefore, demonstrates that rejection does not automatically

22  terminate the debtor's obligations under the contract or prohibit the non-debtor from seeking equitable

23  relief.

24        The final case cited by the bankruptcy court – *Cloyd v. GRP Records*, 238 B.R. 328 (Bankr. E.D.

25  Mich. 1999) –  does appear to suggest that rejection itself, rather than limitation of the non-debtor's

26  remedies to a claim against the estate, relieves the debtor of the obligation to perform.  The *Cloyd* court

27  rejected the non-debtor's argument that "the debtor may only receive relief by obtaining a discharge

28  pursuant to 11 U.S.C. § 727 rather than [through] rejection of the agreement."  *Id.* at 334.  Thus, although

*Cloyd* did not plainly hold that "rejection equals termination," it intimated that rejection relieved the debtor of his contractual obligations.  The *Cloyd* court appeared to believe that this "limitation [on] the trustee's ability to enforce personal service contracts was incorporated under § 365 as a means of protecting debtors against involuntary servitude."  As noted, however, the primary purpose for allowing a trustee to reject a contract is to protect the estate from burdensome obligations.  While rejection may often have the effect of relieving burdens on the debtor, this is not the primary function of the doctrine.  Moreover, it is not necessary to conclude that rejection terminates a debtor's obligations under a contract to protect against involuntary servitude.  Executory contracts can be enforced through specific performance only if such relief is available under state law.  State law regarding specific performance reflects the same concerns regarding involuntary servitude that *Cloyd* cited as support for its interpretation of the rejection doctrine.  *Cloyd*'s reasoning is therefore unpersuasive, and the court declines to follow it.

In sum, the court concludes that the bankruptcy court's decision that rejection of the promotional agreement, by itself, "terminated" the contract and extinguished Top Rank's ability to seek equitable relief for breach of contract was error.  While there are many reasons why equitable relief enforcing a personal services contract may be unavailable, section 365 does not invite a court to invoke those reasons as a basis for treating rejection as a termination of the contract.  Because section 365 adopts no specialized rule governing personal services contracts, the effect of rejection of a personal services contract is determined by section 365(g).  This statute provides that rejection of an executory contract constitutes a breach of the contract and no more.      To determine whether any provisions of the contract remain enforceable against the debtor, rather than as claims against the estate, courts must assess whether the right to an equitable remedy is a "claim" dischargeable in bankruptcy.  This in turn requires an inquiry as to whether an equitable remedy is available under state law.  Section 365 simply does not speak to which obligations may and may not be enforced post-bankruptcy against the debtor.  Consequently, the bankruptcy court's conclusion that the trustee's rejection of the contract between Ortiz and Top Rank terminated the contract and extinguished any claim for breach that Top Rank may have

was erroneous.[24]

---

[24]Ortiz also argues that in enacting 11 U.S.C. § 707(b)(3)(B), a provision of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Congress implicitly acknowledged that personal services contracts constitute an exception to the general rule set forth in section 365.  Section 707(1) authorizes courts to "dismiss a case filed by an individual debtor under [chapter 7] whose debts are primarily consumer debts, or, with the debtor's consent, [to] convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter."  Section 707(3) provides guidance as to relief would constitute an "abuse" of the provisions of chapter 7:

> "In considering under paragraph (1) whether the granting of relief would be an
>  abuse of the provisions of this chapter . . ., the court shall consider –
>> (A) whether the debtor filed the petition in bad faith; or
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse."

Citing the parenthetical clause in section 707(b)(3)(B), Ortiz suggests that by identifying the debtor's "financial need" to reject a personal services contract as a relevant factor, Congress acknowledged that rejection of a personal services contract terminates the agreement.

On its face, the parenthetical clause says nothing about the effect of rejection or when rejection is proper.  The statute's reference to "financial need" does suggest that Congress believed rejection would potentially affect a debtor's finances.  This evidence of Congress's understanding, however, sheds little light on the effect of rejection.  Rejection need not terminate a contract to have a positive effect on a debtor's financial situation.  Courts that have treated rejection as merely a breach have observed that rejection-as-breach can have financial benefits for the debtor.  See *Onecast Media*, 439 F.3d at 563 ("[R]ejection of an executory contract serves two purposes.  It relieves the debtor of burdensome future obligations while he is trying to recover financially and it constitutes a breach of a contract which permits the other party to file a creditor's claim").  As *Brown* demonstrates, moreover, although rejection is not necessarily equivalent to termination, it will often, as a practical matter, relieve the debtor of the burden of performing under a personal services contract.

Nothing in the legislative history of BAPCPA supports Ortiz's argument that Congress intended to acknowledge an implicit exception to section 365 for personal services contracts.  The purpose of BAPCPA was to reduce the number of consumer bankruptcy filings and ensure that debtors repay their creditors as much money as possible.  *In re Gagne*, 394 B.R. 219, 228-29 (B.A.P. 1st Cir. 2008) ("Regarding the purpose of BAPCPA, the House Committee on the Judiciary wrote: The purpose of [BAPCPA] is to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy system and ensure that the system is fair for both debtors and creditors.  With respect to the interests of creditors, the proposed reforms respond to many of the factors contributing to the increase in consumer bankruptcy filings, such as lack of personal financial accountability, the proliferation of serial filings, and the absence of effective oversight to eliminate abuse in the system.  The heart of the bill's consumer bankruptcy reforms consists of the implementation of an income/expense screening mechanism ('needs-based bankruptcy relief' or 'means testing'), which is intended to ensure that debtors repay creditors the maximum they can afford," quoting H.R.Rep. No. 109-31, pt. 1, at 2 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 89 (2005)); see also *Warren v. Wirum*, 378 B.R. 640, 644 (N.D. Cal. 2007) ("The avowed purpose of BAPCPA was to reduce the number of bankruptcy filings, which Congress viewed as excessive and used too often 'as a first resort, rather than

1

2         **C.**      **Whether Resolution of the Reasonableness Issue was Proper on Summary Judgment**

3         This does not end the court's inquiry, however.  The bankruptcy court also conducted the analysis

4 suggested by *In re Brown* to determine whether an equitable remedy was available for breach of the

5 promotional agreement.  It held that the exclusivity provision in the agreement was unreasonable and

6 ────────────────

7 a last resort,'" quoting H.R. Rep. 109-31 at 4, reprinted in, 2005 U.S.C.C.A.N. 88, 90 (2005)).  The
parenthetical reference to personal services contracts was added largely as a compromise response to

8 lobbying by the recording industry, which argued for a prohibition on rejection of personal services
contracts, on the one hand, and recording artists' unions, which opposed such a prohibition, on the other.

9 See Marianne B. Culhane & Michaela M. White, *Catching Can-Pay Debtors: Is The Means Test The*

10 *Only Way?*, 13 AM. BANKR. INST. L. REV. 665, 693 (2005) ("The recording industry lobbied for stiff
limits on rejection of recording contracts, but artists' unions were vigilant, and the provision finally

11 enacted is far weaker than the flat prohibition the industry sought").  As *Brown* and other cases
illustrate, record companies and artists have reason to fight over the availability of rejection whether or

12 not it automatically "terminates" a contract.

13     Had Congress wished to add an exception to section 365's treatment of rejection for personal
services contracts, or even implicitly acknowledge some courts' adoption of one, there were more direct

14 ways of doing so than the addition of a parenthetical phrase to an amendment largely concerned with
"abusive" consumer bankruptcies.  Indeed, it is unclear whether section 707(b)(3) was intended to alter

15 any aspect of existing law.  See *In re O'Brien*, 373 B.R. 503, 506 (Bankr. N.D. Ohio 2007) ("This Court
has observed, as have others, that § 707(b)(3) is best understood as a codification of pre-BAPCPA case

16 law"); see also Debra Grassgreen, *Individual Chapter 11 Cases after BAPCPA: What Happened to the*

17 *"Fresh Start?"*, 2006 NORTON ANN. SURV. BANKR.LAW, PART I § 12 (Sept. 2006) (surveying changes
in the bankruptcy law post-BAPCPA and noting that "[r]ejection alone does not always end the debate

18 about employment contracts.  Once rejection of a personal services contract is permitted, one of the key
issues the individual debtor faces under both the old and the new law is the effect of the rejection on the

19 nondebtor party's ability to enforce 'noncompete' and 'exclusivity' provisions in the rejected

20 employment contract. . . . [A]lthough under [BAPCPA] the likelihood of rejection of a personal service
contact is reduced, in the event that a debtor does reject such a contract, he or she will still face the

21 question of whether noncompete clauses and other equitable relief that may be sought by an employer
may be discharged in the bankruptcy case").

22     Finally, as Top Rank notes, the presence of explicit exceptions for other types of contracts in

23 section 365 argues against finding an implicit exception for personal services contracts.  See *United
States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not

24 follow that courts have authority to create others.  The proper inference, and the one we adopt here, is
that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set

25 forth"); *In re Mirant Corp.*, 378 F.3d 511, 522 (5th Cir. 2004) ("In light of the numerous specific
exceptions to the general § 365(a) authority to reject contracts that Congress chose to include in the

26 Bankruptcy Code, including those for other contracts subject to extensive regulation, and the absence

27 of any exception for contracts subject to FERC jurisdiction, it is clear that Congress intended § 365(a)
to apply to contracts subject to FERC regulation").

28     Accordingly, Ortiz's argument regarding section 707(b)(3)(B) is unavailing.

1  therefore unenforceable under Nevada law, and thus that Top Rank was limited to a claim for monetary

2  damages against the estate.[25]   Top Rank asserts that this alternate holding was erroneous as well.  It

3  argues that (1) the court should not have addressed the reasonableness of the exclusivity provision

4  because it was not raised by Ortiz and because "Top Rank was not given notice [of the court's intention

5  to decide the matter] or the ability to respond"; and (2) that the court's conclusion that the exclusivity

6  provision was unreasonable was erroneous.

7         **1.**    **Standard Governing Summary Judgment on Grounds not Raised by the**

8         **Moving Party**

9         In general, it is improper for a court to grant summary judgment on grounds not raised by the

10  moving party.  See *John Deere Co. v. American Nat. Bank, Stafford*, 809 F.2d 1190, 1191-92 (5th Cir.

11  1987) (reversing a grant of summary judgment on the grounds that plaintiff had not presented evidence

12  of damages, where defendant's motion raised only a *res judicata* defense, and explaining that "[s]ince

13  the district court's grant of summary judgment was not based on grounds advanced by [defendant], and

14  no opportunity was given to [plaintiff] to respond, we must reverse").  In limited circumstances, however,

15  a court can grant summary judgment *sua sponte* on grounds apparent in the record.  See *Ervco, Inc. v.

16  Texaco Refining and Marketing, Inc.*, 422 F.Supp.2d 1084, 1086 (D. Ariz. 2006) ("At issue is whether

17  the Court may grant summary judgment based on an [issue *sua sponte*] that was evident from the record

18  but not explicitly raised in the moving papers. . . . [*S*]*ua sponte* entry of summary judgment is proper if

19  'there is no genuine dispute respecting a material fact essential to the proof of movant's case,'" citing

20  *Buckingham v. United States*, 998 F.2d 735, 742 (9th Cir. 1993)); *Pfenninger v. Exempla, Inc*., 116

21  F.Supp.2d 1184, 1201 n. 3 (D. Colo. 2000) ("[A] district court in appropriate circumstances may grant

22  summary judgment on a ground not formally raised in a summary judgment motion," quoting *Howell

23  Petroleum Corp. v. Leben Oil Corp.*, 976 F.2d 614, 620 (10th Cir. 1992)).  The party against whom

24  summary judgment is granted "must be given reasonable notice that the sufficiency of his or her claim

25  [or defense] will be in issue," however.  See *Verizon Delaware, Inc. v. Covad Communications Co.*, 377

26  F.3d 1081, 1092 (9th Cir. 2004) (quoting  *Buckingham*, 998 F.2d 735 at 742); see also *Celotex*, 477 U.S.

27

28      [25]ER at 507-08.

1  at 326 (district courts may "enter summary judgments *sua sponte*, so long as the losing party was on

2  notice that she had to come forward with all of her evidence"); *Judwin Properties, Inc. v. U.S. Fire Ins.*

3  *Co.*, 973 F.2d 432, 436 (5th Cir. 1992) ("A district court may grant a motion for summary judgment *sua*

4  *sponte*, provided that it gives proper notice to the adverse party").

5      "Reasonable notice implies adequate time to develop the facts on which the litigant will depend

6  to oppose summary judgment." *Buckingham*, 998 F.2d 735 at 742 (quoting *Portsmouth Square v.*

7  *Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985)).  Reasonable notice also requires that

8  a party have "'a full and fair opportunity to draw the [c]ourt's attention to facts and authority in support

9  of its position.'"  *McCoy v. Terhune*, No. 2:01-cv-1218-RRB, 2008 WL 802499, *2 (E.D. Cal. Mar. 24,

10 2008) (quoting *Greenwood v. Hartford Life Ins. Co.*, 471 F.Supp.2d 1049, 1053 (C.D. Cal. 2007)).  "Any

11 doubt about whether notice is required . . . should be resolved in favor of the party against whom

12 summary judgment is sought and [to whom] notice must be given." *Ervco, Inc.*, 422 F.Supp.2d at 1086

13 (citing *HS Resources, Inc. v. Wingate*, 327 F.3d 432, 441 (5th Cir. 2003)); see also *McCoy*, 2008 WL

14 802499 at *2 ("The distinction [between the moving and non-moving party] is significant because the

15 moving party often has 'a full and fair opportunity to draw the [c]ourt's attention to facts and authority

16 in support of its position,'" quoting *Greenwood*, 471 F.Supp.2d at 1053).

17          **2.      Whether Top Rank Had Notice that the Reasonableness of the Exclusivity**

18                   **Provision Was at Issue**

19      Ortiz did not raise the reasonableness of the exclusivity provision in his motion for summary

20 judgment.  The motion asserted only that the promotional agreement had been terminated by the trustee's

21 deemed rejection.[26]  Ortiz's complaint also addressed only this narrow issue.[27]  Ortiz contends that it was

22 appropriate for the bankruptcy court to address reasonableness because Top Rank raised the issue in its

23 opposition in a footnote.[28]  In its opposition, Top Rank summarized the facts of the case and cited *Brown*,

24 1997 WL 786994, for the proposition that "rejection [is] the equivalent of a pre-petition breach and

25

26      [26]*Id.* at 180-92.

27      [27]*Id.* at 1-8.

28      [28]Appellees' Mot. at 19, 23 (citing ER at 329).

[does] not extinguish [an] equitable right of exclusivity."[29]  In a footnote to this discussion, it stated:

> "*Brown* ultimately determined the record label was not permitted to enforce the covenant not to compete because California statutory law does not permit it.  *Brown*, 1997 WL 786994, at *5-6.  The Promotional Agreement here is governed by Nevada law.  (Ex. 1, ¶ 26.)  Unlike California, Nevada courts enforce reasonable non-compete provisions.  *See*, *e.g.*, *Hansen v. Edwards*, 83 Nev. 189, 191 (Nev. 1967); *see also In re Klein*, 218 B.R. 787, 790-91 (Bankr. W.D. Pa. 1998) (whether post-rejection non-compete provision is enforceable must be analyzed under state law)."[30]

In his reply, Ortiz did not reference this footnote, *Brown* or Nevada law on the enforcement of covenants not to compete.[31]  Rather, he continued to argue that he was entitled to summary judgment on the narrow ground that rejection terminated his obligations under the promotional agreement.  The bankruptcy court did not ask either party to address reasonableness at the hearing, and Top Rank thus had no notice that the court intended to make it the basis of her alternate ruling.  As a consequence, Top Rank did not have a "'full and fair opportunity to draw the [c]ourt's attention to facts and authority in support of its position'" that the provision is reasonable.  See *McCoy*, 2008 WL 802499 at *2 (quoting *Greenwood*, 471 F.Supp.2d at 1053).  Because Top Rank did not have notice that reasonableness might be decided on summary judgment, and because it was not given a full and fair opportunity to proffer evidence and argument supporting its position on the issue, the bankruptcy court erred in granting summary judgment on the grounds that the exclusivity provision was unreasonable under Nevada law.

### 3.        Whether the Record Was Sufficient to Permit Decision of the Reasonableness Question

"Where . . . the decision of a question of law by the Court depends upon an inquiry into the surrounding facts and circumstances, the Court should refuse to grant a motion for a summary judgment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably

---

[29]*Id.*

[30]*Id.*

[31]*Id.* at 378-86.

20

certain that it is making a correct determination of the question of law." *Davidson v. Stanadyne, Inc.*, 718 F.2d 1334, 1339 (5th Cir. 1983) (quoting *Palmer v. Chamberlin*, 191 F.2d 532, 540 (5th Cir. 1951)): see also *Eby v. Reb Realty, Inc.*, 495 F.2d 646, 649 (9th Cir. 1974) ("[E]ven when the question is denominated one of law, it will not always be proper to enter summary judgment.  In certain cases summary judgment may be inapposite because the legal issue is so complex, difficult, or insufficiently highlighted that further factual elucidation is essential for its prudently considered resolution"); *Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1377 (11th Cir. 1982) ("[I]f the facts have not been sufficiently developed to enable the court to be certain that it is making a correct determination of the law, or the decision of a question of law by the court depends upon an inquiry into the surrounding facts and circumstances, then summary judgment should not be entered"); *Smith v. Grumman-Olsen Corp.*, 913 F.Supp. 1077, 1086 (E.D. Tenn.1995) (citing *Palmer*, 191 F.2d at 540).  This raises the question whether the reasonableness of the exclusivity provision is a question of fact or law, and whether it was proper for the bankruptcy court to address the issue on the basis of the limited factual record before it.

Whether the reasonableness of a covenant not to compete is a question of law or fact is decided under state law.  See *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 600 (9th Cir. 1991) ("In this case, both parties agree to de novo review of the restrictive covenant's reasonableness.  Generally, the classification of this issue as legal or factual depends upon state law").

The Supreme Court of Nevada has stated the rule on the reasonableness of a covenant not to compete as follows:

"An agreement on the part of an employee not to compete with his employer after termination of the employment is in restraint of trade and will not be enforced in accordance with its terms unless the same are reasonable.  Where the public interest is not directly involved, the test usually stated for determining the validity of the [non-competition] covenant as written is whether it imposes upon the employee any greater restraint than is reasonably necessary to protect the business and good will of the employer.  A restraint of trade is unreasonable, in the absence of statutory authorization or dominant social or economic justification, if it is greater than is required for the protection of the person for whose benefit the restraint is imposed or imposes undue

21

1    hardship upon the person restricted.  The period of time during which the restraint is to

2    last and the territory that is included are important factors to be considered in determining

3    the reasonableness of the agreement." *Camco, Inc. v. Baker*, 113 Nev. 512, 518 (1997)

4    (quoting *Hansen v. Edwards*, 83 Nev. 189, 191-92 (1967)).

5    Whether Nevada treats reasonableness as a question of law is not entirely clear, however.  In *Camco,*

6    *Inc.*, the Nevada Supreme Court described the issue as a matter to be decided at trial, suggesting that it

7    was factual in nature.  See *Camco, Inc.*, 113 Nev. at 518 ("In determining whether Camco enjoyed a

8    reasonable probability of success on the merits of its case, the court must consider whether the provisions

9    of the non-competition agreements would likely be found reasonable *at trial*" (emphasis added)); see also

10   *Sheehan & Sheehan v. Nelson Malley and Co.*, 121 Nev. 481, 489 (2005) ("We construe covenants not

11   to compete according to their plain language, and such covenants are enforceable only if they are

12   reasonable *under the circumstances*" (emphasis added)); see also *Rent-A-Center*, 944 F.2d at 600

13   (concluding that reasonableness was a question of fact under Kansas law where "'the test . . . [was]

14   whether the restraint is reasonable under the facts and circumstances of the particular case,'" quoting

15   *Eastern Distributing Co. v. Flynn*, 222 Kan. 666, 670 (1977)).  The *Camco* court nonetheless appeared

16   to decide reasonableness as a question of law:

17    "In light of this court's acknowledg[ment] that non-compete covenants are restraints of

18    trade and subject to careful scrutiny when made in an employment context, we hold that

19    the covenant at issue is overly broad as to future territory for possible expansion.

20    Therefore, even though there was consideration to support the Bakers and Grosses'

21    agreements not to compete with SuperPawn, we conclude that Camco did not enjoy a

22    reasonable likelihood of success on the merits of its claim, and thus injunctive relief was

23    properly denied. . . . [W]e . . . conclude that the provisions at issue are unreasonable in

24    territorial scope and therefore unenforceable as against public policy." *Camco, Inc.*, 113

25    Nev. at 519.

26   The Nevada Supreme Court has also approved a trial court's resolution of the issue on summary

27   judgment.  See *Jones v. Deeter*, 112 Nev. 291, 293-95 (1996) (addressing the district court's resolution

28   of reasonableness at summary judgment stage and holding that a covenant was "per se unreasonable and

1 therefore, unenforceable").  This supports the view that the issue is a question of law.

2 *Hansen v. Edwards*, 83 Nev. 189 (1967), likewise suggests that reasonableness is a question of

3 law.  There, the court stated: "It appears that the trial court by granting the injunction decided only that

4 the covenant was valid and reserved the question of reasonableness to the trial on merits.  However, a

5 review of the record permits the conclusion that nothing more can be added than is presently known that

6 would affect a determination of that question.  The circumstances of this case warrant a confinement of

7 the area of restraint to the boundary limits of the City of Reno and a time interval of one year

8 commencing February 10, 1967, the date of the injunction. . . . We deem the restriction thus modified

9 to be reasonable."  *Id.* at 192-93; but see *id.* at 193 (Collins, J., dissenting) ("I do not agree that a review

10 of the record of the hearing pertaining to the granting of the injunction now permits us to fix, as a matter

11 of law, the reasonableness of the restraint either as to time or space. . . .  We should decide, in my

12 opinion, only that covenants in restraint of trade are not ipso facto void in Nevada under our existing

13 general principles of law.  Therefore, the granting of the preliminary injunction pending a determination

14 on the merits was within the lower court's discretion. . . .  The reasonableness of the restraint as to time

15 requires a further factual consideration in this case which is not within our province to make initially").

16 As this review of pertinent decisions indicates, the weight of Nevada authority appears to view

17 reasonableness as a question of law.  Nonetheless, Nevada courts have generally not decided the

18 reasonableness of a covenant not to compete solely on the face of the provision at issue.  Rather, they

19 have considered other relevant facts in assessing reasonableness.  See *Camco, Inc*., 113 Nev. at 520

20 (considering the fact that "Camco had no customer contacts or good will established in Bullhead City and

21 had not signed a lease or begun construction of a store in that area" in concluding that the geographic

22 scope of a covenant not to compete was unreasonably broad and unenforceable); *Jones*, 112 Nev. at 296

23 (considering the fact that "it appears that developing a customer base for the lighting retrofitting business

24 is difficult" but concluding that a covenant's "five-year duration [was] not reasonably necessary to

25 protect Deeter's business and place[d] too great a hardship on Jones"); *Hansen*, 83 Nev. at 1 (considering

26 the fact that "[i]n the short time that Hansen opened his office after terminating the employment contract

27 he acquired approximately 180 of Edwards' customers" in assessing the reasonableness of a non-

28 competition clause in dispute between two podiatrists, formerly employer and employee).

It does not appear from the record that the bankruptcy court considered the facts and circumstances surrounding the parties' entry into the agreement, the boxing industry or Ortiz's prominence or place in it in finding the exclusivity provision unreasonable as a matter of law.[32] Rather, it examined the terms of the contract and determined that it was "by and large extremely one sided."[33] The court did observe that enforcement of the exclusivity provision might harm Ortiz's career.[34] The record is devoid of evidence regarding the extent to which the provision is necessary to protect Top Rank's business, however. The court therefore concludes that it was not appropriate for the bankruptcy court to decide the reasonableness of the exclusivity provision based solely on the incomplete record before it. See *Eby*, 495 F.2d at 649 (summary judgment on a question of law is inappropriate where the legal issue is "so . . . insufficiently highlighted that further factual elucidation is essential for its prudently considered resolution"); see also *Davidson*, 718 F.2d at 1339; *Clark*, 692 F.2d at 1377; *Smith*, 913 F.Supp. at 1086; *Mitchell*, 249 B.R. at 60 (noting that a non-debtor's entitlement to injunctive relief to enforce a non-competition provision was "a decision which . . . [was] difficult to reach in a vacuum"). Both because Top Rank lacked adequate notice of the bankruptcy court's intention to rule on reasonableness and because the record was not sufficiently developed for considered resolution of the issue, the bankruptcy court's decision that the exclusivity provision was unreasonable must be reversed.

## III.  CONCLUSION

For the reasons stated, the decision of the bankruptcy court is reversed.  The case is remanded for further proceedings consistent with this order.

DATED: January 21, 2009

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[32]ER at 502-07.

[33]*Id.* at 507.

[34]*Id.* at 503.